

EOD
09/04/2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TED B. CAMP | § | CASE NO. 08-41290 |
| and SUSAN M. CAMP, | § | Chapter 7 |
| | § | |
| Debtors. | § | |

## MEMORANDUM OPINION

This matter is before the Court on the Motion to Dismiss filed by the United States Trustee (the "Trustee") pursuant to 11 U.S.C. §707(b) and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 1017(e). The Motion to Dismiss was timely filed and properly served on the Debtors, Ted and Susan Camp. The Court heard the Motion to Dismiss on November 20, 2008, at which time the parties presented argument and evidence. At the conclusion of the hearing, the Court scheduled the matter for a later ruling.

## JURISDICTION

This contested matter arises under 11 U.S.C. §707(b) and is a core proceeding under 28 U.S.C. §157(b)(2). This Court, therefore, has jurisdiction to enter a final order pursuant to 28 U.S.C. §§ 157(a) and 1334. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.[1]

## BACKGROUND

**A.**

Section 707(a) governs the dismissal of all bankruptcy filings when adequate "cause" has been shown. This provision was enacted as part of the Bankruptcy Reform Act of 1978 (the "1978

---

[1] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. Likewise, to the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

Act"). *See* Pub. L. No. 95-598, 92 Stat. 2549 (codified as amended at 11 U.S.C. §707(a)). Several years later, Congress added subsection (b) through the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act"). *See* Pub. L. No. 98-353, 98 Stat. 333 (codified as amended at 11 U.S.C. §707(b)). Congress enacted §707(b) as part of a package of consumer credit amendments in response to perceived abuses by consumer filers. *See* 6 COLLIER ON BANKRUPTCY, ¶ 707.LH[2] (15th ed. rev. 2005).

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "BAPCPA"), which became fully effective on October 17, 2005, significantly amended §707(b). One goal of the BAPCPA was "to address what Congress perceived to be certain abuses of the bankruptcy process. Among the abuses identified by Congress was the easy access to [C]hapter 7 liquidation proceedings by consumer debtors, who if required to file under [C]hapter 13, could afford to pay some dividend to their unsecured creditors." *In re Hardacre,* 338 B.R. 718, 720 (Bankr. N.D. Tex. 2006) (citing 151 CONG. REC. S2459, 2469-70 (Mar. 10, 2005)). "The principal method implemented to steer debtors away from Chapter 7 and into Chapter 13 is the new version of §707," which is usually referred to as the "means test." *In re Singletary,* 354 B.R. 455, 458-59 (Bankr. S.D. Tex. 2006).

Prior to the enactment of the BAPCPA, §707(b) of the Bankruptcy Code provided for the dismissal of a case when "the granting of relief would be a substantial abuse of the provisions of this chapter." There was a presumption in favor of granting the relief sought by the debtor (*i.e.*, a discharge), and the burden of proof and production rested on the party seeking dismissal. *See generally* 6 COLLIER ON BANKRUPTCY ¶707.04[5][a] (15th ed. rev. 2009). The BAPCPA altered the circumstances under which a case may be dismissed by removing the "substantial" qualifier and providing for "abuse" to be determined pursuant to either the new §707(b)(2) or the new §707(b)(3). When a debtor's disposable income exceeds fixed amounts (*i.e.*, when the debtor fails the "means

2

test"), the new §707(b)(2) creates a presumption of abuse. When the presumption of abuse does not arise, the new §707(b)(3) looks to the debtor's intent in filing the bankruptcy petition and the totality of the circumstances to determine abuse.

The present case involves both grounds for dismissal. The Trustee contends that the Debtors fail the means test, and a presumption of abuse arises, because their obligations regarding a home they surrendered after filing for bankruptcy should not be considered when calculating disposable income. The Trustee alternatively contends that the Debtors have an ability to repay a portion of their indebtedness outside of Chapter 7 with reasonable adjustments to their standard of living. Thus, the Trustee argues that this case should be dismissed because "the totality of the circumstances ... of the [Debtors'] financial situation demonstrates abuse," 11 U.S.C. §707(b)(3)(B)

**B.**

The Debtors initiated this bankruptcy case by filing a petition for relief under Chapter 7 of the Bankruptcy Code on May 22, 2008 (the "Petition Date"). A meeting of creditors was held on June 20, 2008, pursuant to § 341 of the Bankruptcy Code. On June 25, 2008, the Trustee filed a statement that the Debtors' case should be presumed abusive. The Trustee filed the Motion to Dismiss less than thirty days later. The Debtors opposed the Motion to Dismiss, filing a response on August 10, 2008.

Mr. Camp has been employed as a pilot for American Airlines for more than 18 years. In 1998, he married his wife, Susan, who is also a debtor in this case. At some point after their marriage, Mrs. Camp ceased working outside the home.

Prior to August 2007, the Debtors and their daughter lived near Orlando, Florida. Mr. Camp co-piloted a regular monthly schedule of international flights from New York City to London. In addition to Mr. Camp's employment as a pilot, the Debtors incorporated TSA Golf in 2003 in the

3

state of Florida and, through that corporation, operated a golfing franchise known as Golf USA. In 2006, the Debtors refinanced their home so that they could invest some of their equity into their golfing business.

In addition to their home in Florida, the Debtors purchased a fractional ownership in a property located in Hilton Head, South Carolina, in May 1998. The Debtors are currently paying $380.26 each month for the mortgage on their time-share interest in the property, and the Debtors also must pay an annual fee to the homeowners' association in the total amount of $3,600. Mr. Camp testified that he would like to keep the time share so that he, his wife, and his daughter can continue to enjoy annual vacations in Hilton Head with his extended family. Mr. Camp testified that an additional benefit of the time share is that he can play golf at reduced fees at certain private clubs throughout the country.

In or around March 2007, the Debtors decided to move to McKinney, Texas, so that Mr. Camp would be closer to the hub of American Airline's operations in Dallas/Fort Worth. Mr. Camp planned to continue to co-pilot his regular monthly schedule of international flights from New York City, but he hoped that moving to Texas would increase his chances for promotion to captain. The Debtors also believed that moving to McKinney, Texas, would allow them to put their young daughter into a better public school system.

In March 2007, the Debtors signed a contract to complete the construction of a new home in McKinney. The house was scheduled to be finished in September 2007. The Debtors placed their Florida home on the market and decided to sell their golfing business in order to facilitate their move to Texas. The Debtors believed at the time that they had approximately $80,000 in equity in their Florida home. With respect to their golfing business, Mr. Camp testified that they had invested $115,000 in TSA Golf and hoped to recover their investment plus a small profit.

4

The Debtors originally attempted to sell their golfing business for approximately $550,000 based on an estimated value they had received from a business broker in Florida. They had been operating their golfing business for three years at that point. They ultimately sold the business on November 6, 2007, for a gross sales price of $437,375.[2] Mr. Camp testified that they received approximately $40,000 in net sales proceeds after repaying certain investors and that only about $15,000 of this amount remained after he paid the balance owing on his business credit card. He testified that he used the $15,000 to pay several business vendors and to make several mortgage payments on his Florida house. Mr. Camp estimated that he and his wife lost $115,000 - $120,000 through their investment in TSA Golf.

The Debtors placed their Florida home on the market for $500,000. Mr. Camp testified that their home was appraised for $530,000 in 2006, so they believed it was priced to sell quickly. The Debtors moved to Texas in August 2007 and rented an apartment. The Debtors' paid for their moving expenses with a credit card, which had a balance of $17,826.63 when the Debtors filed for bankruptcy. The Debtors closed on their new home on October 31, 2007.

The Debtors' former home in Florida did not sell quickly. Mr. Camp testified that his monthly mortgage payment was $2,500 and that he was required to pay an additional $300 each month for homeowners' association fees. The Debtors began renting their Florida home to a tenant in November or December 2007 for $1,750 per month.

The monthly mortgage payment for the Debtors' home in Texas is $3,361.71, which includes real estate taxes and property insurance. The Debtors' home consists of more than 3,500 square feet and includes four bedrooms, an office, a family room, a media room, and a game room. The media

---

[2] TSA Golf had paid for the lease of a Mercedes SLK for Mr. Camp. In addition to payment of the gross sales price, the purchase agreement provided, among other things, that the purchaser would continue to make the lease payments for Mr. Camp's vehicle until the end of the lease term in January 2008.

room includes a built-in projection television, which the Debtors paid for as part of the purchase price of their new home. The documentary evidence reflects Debtors used their credit to purchase furniture and appliances for their new home in October 2007 and November 2007. In November 2007, among other purchases, the Debtors used their credit to purchase a large, flat screen television and ceiling-mounted speakers for the family room.

According to Mr. Camp, money began "getting tight" immediately after he and his family moved into their new home. Mr. Camp testified that he ceased making contributions to his retirement account at that time. Nonetheless, in November 2007, the Debtors used unsecured credit to purchase a refrigerator for approximately $2,700 as well as approximately $8,200 for television and audio equipment. In addition, in January 2008, the Debtors purchased a 2004 Mercedes E320 wagon for Mrs. Camp to drive. The Debtors consulted with a bankruptcy attorney in February 2008 and paid a portion of a retainer to that attorney.

In April 2008, Mr. Camp was promoted from co-pilot to captain. He began to receive pay at a higher hourly rate. Mr. Camp testified, however, that this increase in income has been offset by increased expenses in the amount of approximately $750 each month. Mr. Camp is now based out of Miami and is required to spend a portion of each month in Miami in order to be available for flights. Mr. Camp explained that he does not have the seniority as a captain to hold a regular weekly schedule of flights. Miami does not have "crash pads" available for his use, and, therefore, he is required to rent hotel rooms and automobiles when he is in Miami. Mr. Camp testified that American Airlines does not reimburse him for his housing and transportation expenses.

The Debtors made their last mortgage payment on their Florida house on or about March 1, 2008. The Debtors continued to receive rental payments through April 2008. On May 21, 2008, the

day before they filed for bankruptcy, the Debtors returned the $2,000 deposit they had received from their tenant in Florida. They had not yet sold the Florida house when they filed for bankruptcy in May 2008. The Florida house was encumbered by two mortgages, which totaled approximately $420,000, as of the Petition Date.

Mr. Camp testified that they have been attempting to reduce their expenses and economize. He testified, for example, that they did not purchase a gym membership like they had in Florida after moving to Texas, and that they are eating at home more often. He plays golf less often, and Mrs. Camp took a part-time job in August 2008. At the time of the hearing, Mrs. Camp was earning gross wages of approximately $1,400 per month as an assistant librarian for a local school district.

The documentary evidence reflects that the Debtors have continued to enjoy an affluent lifestyle. The Debtors' expenses for entertainment and dining out averaged approximately $1,450 each month for the first eight months of 2008. For example, from January 10, 2008 through February 8, 2008, the Debtors spent approximately $1,400 on meals out, jewelry purchases, and overdraft charges. From February 9, 2008 – March 10, 2008, the Debtors spent approximately $1,400 on entertainment and dining expenses. Mr. Camp spent approximately $1,410 in March 2008 when he took his daughter and several of her friends to Sea World in San Antonio. In April 2008, Mr. Camp purchased tickets for his daughter to go to a Jonas Brothers concert and made a payment to a jeweler for a watch he had previously contracted to purchase for his wife. In June 2008, Mr. Camp took his daughter and seven or eight of her friends to Kobe Steaks to celebrate his daughter's birthday. In addition, the Debtors and their daughter vacationed in Hilton Head during June 2008. Finally, in August 2008, Mr. Camp paid for his daughter and several of her friends to visit Hurricane Harbor.

The Debtors' assets included two whole life insurance policies valued at the total amount of

approximately $10,500 as of the Petition Date. The Debtors' claimed these policies as exempt from their creditors in their bankruptcy schedules. Mr. Camp testified that he withdrew approximately $3,000 to pay legal bills after filing for bankruptcy and that he withdrew another $5,000 on August 1, 2008, to pay bills. As of the hearing on the Trustee's motion, the value of the policies was nominal due to the withdrawals and market fluctuations.

The Debtors' gross income for 2007 was $220,000 according to their federal income tax return. Of this amount, $101,016 was taxable income from Mr. Camp's employment by American Airlines. The remainder was a capital gain from the sale of the golfing business. Mr. Camp testified that he and his wife owe approximately $10,000 to the Internal Revenue Service relating to their capital gain in 2007.

According to the Debtors' original bankruptcy schedules, Mr. Camp was earning a gross monthly salary of $11,502 and a gross annual salary of $138,000 as of the Petition Date. Mr. Camp was promoted to captain and began receiving higher wages in April 2008. As a captain, he is guaranteed 73 hours a month at $162 an hour (for a monthly salary of $11,826) with a possibility that he might have the opportunity to fly more hours. His gross annual salary as a captain, exclusive of any additional hours he might fly, is $141,912.

Mr. Camp was earning $10,988 each month (net of taxes and pre-tax deductions for health insurance) at the time of trial, and Mrs. Camp was earning a net income of approximately $1,200. In addition to pre-tax deductions, Mr. Camp was making many after tax deductions from his paycheck at the time of trial, including $25 for "credit union," $14.50 for accident insurance, $651.25 for "Var Ben Plan," $125 for union dues, $945 for "Allied First Bank, $23 for "Pilot Mutual Aid," $505.57 for a 401k loan, and $1,000 for "Plt Adv Recovery." When both the pre-tax and after-tax deductions are taken into account, Mr. Camp's monthly take home pay was $7,146.50 at the time of trial.

The Debtors maintain that all of their take-home pay is consumed by their living expenses. These expenses include $479.74 each month for Mrs. Camp's Mercedes E320 wagon, which is valued at $23,575 and has a debt of approximately $28,000 against it. Mr. Camp drives a 2006 Nissan Murano valued at $18,725 with a debt of approximately $30,000 against it. Mr. Camp bought the vehicle new in 2006, and his monthly payment (which includes the negative equity on a prior vehicle) is $723.00.

The Debtors' expenses also include a total of $680.26 per month for their time share in Hilton Head. In addition to their monthly mortgage payment of $3,361, the Debtors spend $300 each month for home maintenance, yard service, and pest control. Mr. Camp testified that their monthly expense for food for a family of three, including the meals he purchases while travelling for work, is at least $1,200. Mr. Camp testified that this expense may increase if his nephew, whose mother is in the armed forces, comes to live with him. The Debtors are spending a total of $235.83 each month for two whole life insurance policies as well as a term insurance policy.

On the other hand, Mr. Camp testified that several of his scheduled expenses have or will decrease. In particular, the Debtors scheduled an expense of $200 per month for the support of Mr. Camp's father, who is in poor health. Mr. Camp testified, however, that he does not anticipate that he will be incurring this expense for the foreseeable future. In addition, the Debtors anticipated that their daughter's orthodontist would be fully paid by December 2008 and that their monthly expense of $235 each month for her orthodontic braces would cease at that time.

The Debtors stated on their bankruptcy petition that their debts were primarily consumer in nature. As every Chapter 7 debtor with primarily consumer debts is required to do, the Debtors filed an Official Form B22A Statement of Current Monthly Income and Means Test Calculation (Chapter 7) ("Official Form B22A"). In their opposition to the Trustee's Motion to Dismiss, the Debtors

9

assert that, in a Chapter 13 case, they would only be required to pay $6,170 to creditors based on their manipulation of their disposable income in their Official Form B22A. Mr. Camp previously agreed to turnover one Tag Heuer watch to the Chapter 7 trustee, which he estimated to be worth $1,000, and he agreed to make three equal payments totaling $5,170 beginning in September 2008.[3] Thus, in exchange for a total payment of $6,170 to the Chapter 7 trustee, the Debtors seek a discharge in this Chapter 7 case.

## ANALYSIS

The starting point in any §707(b) analysis centers on the conditions as they existed at the time the petition was filed. *See In re Pier,* 310 B.R. 347, 354-55 (Bankr. N.D. Ohio 2004). The complicated means test calculation of § 707(b) is implemented in Chapter 7 cases through Official Form B22A. In Chapter 7 cases, the application of this section involves a snapshot of the debtor's financial condition as of the date of the petition for the purpose of determining whether there is presumption of abuse warranting dismissal of the case. *See, e.g., In re Rudler,* 388 B.R. 433, 438-439 (1st Cir. BAP 2008). There is no dispute that, at the time relevant to this case, a presumption of abuse arose if a debtor's net monthly disposable income exceeded $182.50 as calculated on Official Form B22A.

In calculating net monthly disposable income, the means test calls for the deduction of statutorily prescribed monthly expenses from current monthly income. *See* 11 U.S.C. §707(b)(2)(A)(ii). The means test also allows the deduction of projected monthly payments on account of secured debts and priority claims. *See* 11 U.S.C. §707(b)(2)(A)(iii)-(iv). Section 707(b)(2)(A)(iii) defines the debtor's "average monthly payment on account of secured debts," the statutory term at issue in this case, as the sum of "the total amounts scheduled as contractually due to

---

[3] Mr. Camp has reserved the option to turnover another Tag Heuer watch in exchange for a $1,500 credit on his

10

secured creditors in each month of the 60 months following the date of the petition" divided by 60. The dispute in this case turns upon the meaning of the language "scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition."  11 U.S.C. § 707(b)(2)(A)(iii)(I).  The Debtors argue that the sentence should be interpreted in a manner that "as contractually due" means secured debts due on the petition date regardless of whether the debtor intends to pay the debts post-petition.  The Trustee focuses on the end of the sentence, arguing that debts secured by assets that will be surrendered should not be included in the category of debts scheduled during the 60 post-petition months, and, therefore, payments on those debts should not be counted for determining whether there is a presumption of abuse.

Courts are divided on this issue.  Most courts seem to agree, as this Court has previously indicated, that the means test is a snapshot taken on the petition date.  *See, e.g., Hildebrand v. Thomas (In re Thomas),* 395 B.R. 914, 920 (6th Cir. BAP 2008) (collecting cases).  On the other hand, there is support within the Fifth Circuit for the ability to look at events occurring both pre- and post-petition to the debtor's situation in the cases of *In re Singletary,* 354 B.R. 455 (Bankr. S.D. Tex. 2006) and *United States Trustee v. Cortez (In re Cortez),* 457 F.3d 448 (5th Cir. 2006).  In *Cortez*, the Fifth Circuit analyzed a pre-BAPCPA version of §707(b) and found that a bankruptcy court could look at post-petition events, not just income and expenses existing on the petition date, when deciding a motion to dismiss for substantial abuse.  Following *Cortez,* the *Singletary* court determined that the means test calculation should occur as of the filing of the trustee's motion to dismiss, and the court should consider any changed circumstances of the debtor between the filing of the petition and the filing of the motion.  *Id.* at 466 (citing *Cortez,* 457 F.3d at 450-55).

This case, however, does not turn on the presumption of abuse.  The Court has conducted an

---

payment obligation.

evidentiary hearing on the Trustee's argument that the Debtors' petition should be found abusive based on the "totality of the circumstances." 11 U.S.C. §707(b)(3)(B). Regardless of whether deductions for secured debt payments on a house a debtor intends to abandon may be allowed in determining whether there is an evidentiary presumption that the petition is abusive, the debtor's post-petition surrender of the property may be considered in determining whether granting Chapter 7 relief is, in fact, abusive under the totality of the circumstances. *See, e.g., In re Gonzalez,* 388 B.R. 292, 302 fn 5 (Bankr. S.D. Tex. 2008). The Court "must consider the debtor's financial condition at the time of the hearing on the motion to dismiss in determining whether granting Chapter 7 relief is an abuse under § 707(b)(3)." *In re Pennington,* 348 B.R. 647 (Bankr. D. Del. 2006). *See also In re Cortez,* 457 F.3d at 455-456 (in a motion to dismiss for "substantial abuse" under pre-BAPCPA version of §707(b), bankruptcy court can and should consider post-petition events).

Prior to the enactment of the BAPCPA, many courts, including this Court, employed a "totality of the circumstances" standard for determining whether to grant a §707(b) motion to dismiss a debtor's Chapter 7 proceeding based on "substantial abuse." *See, e.g., In re Faulhaber*, 243 B.R. 281, 284 (Bankr. E.D. Tex. 1999). Although Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse," as previously discussed, pre-BAPCPA cases which consider whether a case should be dismissed for substantial abuse remain instructive in an analysis under §707(b)(3). *See, e.g., In re Singletary,* 354 B.R. at 461-62 (describing §707(b)(3) as a codification, and clarification, of the pre-BAPCPA standard under §707(b)); *In re dePellegrini,* 365 B.R. 830, 832 (Bankr. S.D. Ohio 2007) (finding that pre-BAPCPA cases are still instructive under §707(b)(3)). More particularly, "[b]ecause Congress retained the phrase 'totality of the circumstances' in BAPCPA, the Court concludes that it may look to pre-BAPCPA case law to construe the meaning of that phrase under §707(b)(3)." *In re Pfiefer,* 365 B.R.

187, 191 (Bankr. D. Mont. 2007). *See also, e.g., In re Hill*, 328 B.R. 490, 506 (Bankr. S.D. Tex. 2005) ("While the Act adds highly specific calculations to determine whether abuse is presumed under §707(b), the revised statute nonetheless maintains discretionary provisions.").

The Court, therefore, considers the following factors in determining whether grounds exist to dismiss this case for abuse under §707(b)(3) based on the totality of the circumstances:

(1) Whether the Debtors could pay a substantial portion of their debts from future income in a hypothetical Chapter 13 case;

(2) Whether the bankruptcy petition was filed due to sudden illness, calamity, disability, or unemployment;

(3) Whether the Debtors incurred cash advances and made consumer purchases far in excess of their ability to repay;

(4) Whether the Debtors' proposed family budget is reasonable;

(5) Whether the Debtors are seeking to reaffirm a large amount of secured debt to the detriment of unsecured creditors;

(6) Whether the Debtors' schedules and statement of current income and expenses reasonably and accurately reflect their true financial condition;

(7) Whether the Debtors have a stable source of income;

(8) Whether the Debtors are eligible to file a Chapter 13 case;

(9) Whether there are state remedies or private negotiations that the Debtors can invoke to ease their financial predicament;

(10) Whether the Debtors' expenses can be reduced without depriving the Debtors of basic necessities; and

(11) Whether the petition was filed in good faith.

*See Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 914-915 (9th Cir. 1988) (adopting an "ability to pay" test for substantial abuse); *In re Krohn*, 886 F.2d 123, 126-27 (6th Cir. 1989) (adopting a "totality of the circumstances" test for substantial abuse); *Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th Cir. 1991) (adopting a "totality of the circumstances" test for substantial abuse); *Fonder v. U.S.*, 974 F.2d 996 (8th Cir. 1992) (although substantial abuse was established where the trustee showed that the debtor could repay most or all unsecured debt through a Chapter 13 plan, the court emphasized

that eligibility for Chapter 13 is not needed for dismissal under §707(b)); *Cox v. Fokkena (In re Cox),* 315 B.R. 850 (8th Cir. BAP 2004) (substantial abuse where debtors' home costs were more than half their take home income and without them the debtors could have funded a Chapter 13 plan). *See also, e.g., In re Fitzgerald*, 155 B.R. 711, 716 (Bankr. W.D. Tex. 1993) (agreeing with *Kelly* that the primary focus of the court's inquiry should be a debtor's ability to pay); *In re Watkins*, 216 B.R. 394 (Bankr. W.D. Tex. 1994) (adopting the "totality of the circumstances" test with an emphasis on ability to repay).

In this case, the Debtors' discretionary expenses, such as their expenses for food and entertainment, are unusually high for a family of three. The Debtors' current payment for their home mortgage, taxes and insurance is $3,360 each month, as previously discussed, and the Debtors are paying nearly $700 each month for their time share in Hilton Head. The Debtors are spending $1,200 each month for food for a family of three (including dining out expenses incurred by Mr. Camp when he travels for work). Their monthly bills also include a total of $1,202.74 in car payments, $450 for electricity, $150 for water, $90 for cable television, $54 for telephone service, $56 for internet service, $120 for mobile phone service $200-300 for new clothes, $80 for laundry and dry cleaning, $485 for medical and dental expenses (not including insurance deducted from Mr. Camp's pre-tax wages), $620 for transportation expenses (not including car payments), and $50 for recreation, clubs and entertainment.

Although the Debtors were burdened by two home mortgages at the time they filed their bankruptcy petition, they were enjoying a relatively affluent lifestyle. The Debtors filed their petition with the intention of surrendering their former home in Florida and the related secured debt obligation. Now that the Debtors have relinquished the Florida home, there must be some room in their budget to pay their existing unsecured creditors.

14

Following the changes to §707(b), bankruptcy courts applying the totality of the circumstances test have observed that persons, such as the Debtors, with substantial and stable employment "will be hard pressed to establish that they do not have the ability to pay some of their unsecured debt, such as through funding a Chapter 13 plan of reorganization." *In re Wadsworth,* 383 B.R. 330, 333-34 (Bankr. N.D. Ohio 2007). The mechanical calculation of the Debtors' disposable income in their Official Form B22A is merely "the starting point, subject to rebuttal by appropriate evidence of changed circumstances." *Nowlin v. Peak (In re Nowlin)*, -- F.3d --, 2009 WL 2105356 at *6 (5th Cir. 2009). This Court, therefore, does not consider the expenses relating to the Florida home, which the Debtors are no longer incurring, in calculating "projected disposable income" available for payment of the Debtors' unsecured creditors. *See In re Long*, 390 B.R. 581 (Bankr. E.D. Tex. 2008). In addition, Mr. Camp testified that his scheduled expenses have been or will be further reduced by the fact that it appears unnecessary to provide financial support to his father for the foreseeable future and by the anticipated completion of payments to his daughter's orthodontist in December 2008.

The Court acknowledges that in the current financial climate, numerous sellers have suffered a loss in the sale of homes and businesses once believed to have held equity. The Court also recognizes that under certain circumstances, such as a job transfer, a family might find itself in the unenviable position of supporting two mortgages. In this case, however, it appears to the Court that the Debtors' financial problems were not caused by holding two mortgages for a period of time or by their inability to sell their golfing business for a profit, but by living beyond their means. The Debtors do not appear to have made significant changes to their lifestyle. The Debtors appear to have filed this bankruptcy petition primarily to avoid the unsecured debt they incurred in moving to Texas and purchasing goods for their new home as well as any liability relating to the foreclosure

upon their Florida home.

Section 707(b)(3) does not automatically preclude debtors with substantial financial means from obtaining relief under Chapter 7 of the Bankruptcy Code. Unlike the "means test" of §707(b)(2), which is inherently objective, an analysis under §707(b)(3) is subjective, requiring that a court conduct a case-by-case examination of a debtor's financial situation and course of conduct. *See In re Wilson,* 356 B.R. 114, 121 (Bankr. D. Del. 2006). Though the Court is unwilling to create a bright-line rule for determining when expenses are reasonably necessary, the Debtors' expenses in this case are excessive. The Court finds that Debtors' stated monthly living expenses could be materially reduced without depriving them or their one dependent of adequate food, clothing, shelter or other necessities. Their failure to rein in or eliminate especially entertaining and dining out expenses and expenses relating to their time share in Hilton Head mitigates strongly against affording them relief under Chapter 7.

In reaching this conclusion, the Court considered the fact that a central function of bankruptcy law is to afford a debtor a fresh start. *See Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934). At the same time, this policy may be, and often is, subordinated to other policy concerns. For example, as a matter of statute, Congress has determined that certain types of debts are not subject to the fresh start. *See* 11 U.S.C. §523(a) (listing nondischargeable debts). Similarly, certain types of acts may bar a debtor from even receiving a discharge. *See* 11 U.S.C. §727(a) (setting grounds for denial of discharge). Section 707(b) continues along this same line. In enacting §707(b), Congress determined that certain debtors – such as those with the ability to repay their debts or those debtors who filed their petition in bad faith -- should not be afforded the benefits of an immediate fresh start, but, instead, should have their fresh start conditioned on the repayment of at least a portion of their unsecured debts.

## **CONCLUSION**

For all of the foregoing reasons, the Court concludes that the Trustee has established by a preponderance of the evidence that allowing these Debtors to continue in a Chapter 7 proceeding would be an abuse of the bankruptcy system. The Debtors have been living beyond their means, and the totality of the monthly expenses reported by the Debtors does not reflect significant belt-tightening. The Debtors likewise do not appear to have prioritized their expenses to fit within their monthly income. The Debtors enjoy a stable income and good health, and their creditors should not be forced to bear the burden of maintaining the same lifestyle that precipitated this bankruptcy. An order will be entered dismissing the Debtors' bankruptcy petition provided, however, that the Debtors will be given 30 days to convert this case to a case under Chapter 11 or to convert this case to a case Chapter 13 if they so desire.

Signed on 09/04/2009

*Brenda T. Rhoades*  MD
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE